In the Matter of the ESTATE OF Martin V. HENRICH, Deceased.

Appeal of Leon HENRICH, et al.

No. 85–433.

Court of Appeals of Iowa.

June 12, 1986.

John R. Mugan and Alice S. Horneber of Margolin, Gildemeister, Willia, Mugan & Keane, Sioux City, for appellants.

Marvin V. Heidman and Daniel D. Dykstra of Eidsmoe, Heidman, Redmond, Fredregill, Patterson & Schatz, Sioux City, for appellees.

Considered by DONIELSON, P.J., and SNELL and SCHLEGEL, JJ.

SNELL, Judge.

Decedent Martin V. Henrich died of cancer on March 28, 1983, at the age of 85, having never married nor had any children. He lived and worked in the Akron, Iowa area throughout his life. He had eleven brothers and sisters, four of whom predeceased him, and approximately fifty nieces and nephews. In 1974, Martin executed a will naming his great-nephew, James Henrich of Akron, Iowa, as executor. This will divided his estate equally among his nieces and nephews. Martin's attorney at this time was Richard Bauerly, and it was he who prepared the will.

James W. Henrich has always lived in the Akron area. James had a good family relationship with Martin. He saw Martin at church, sometimes had coffee with him on Sunday morning, occasionally played cards and went out to dinner with Martin, and helped Martin with some odd jobs, including cleaning out his apartment when he moved into the nursing home. Nursing home records indicated James was named in the nursing home admission agreement as one of the individuals to be contacted in the event of emergency. James sometimes assisted Martin by running errands for him and picking up his mail.

About 1975, Martin was diagnosed as having cancer and over the next few years underwent a variety of cancer treatments as an outpatient. He was eventually admitted into a hospital for radiation therapy in the summer of 1982. In early August of 1982, James Henrich and Martin's brother, Ed Henrich, visited Martin. During the visit, Martin asked Ed if he would contact Richard A. Bauerly of LeMars, Iowa, Martin's attorney, and have him come to the hospital. Ed contacted Bauerly on August 7, 1982, telling him that Martin wanted to see him. Bauerly visited Martin and learned that he wished to change his will. Bauerly prepared the will and had one of his law partners, C.W. Down, deliver the will to Martin. On August 9, 1982, Martin revoked his 1974 will and executed a new will naming James Henrich executor and sole beneficiary. This will provided:

ONE: Subject to the payment of my just debts and the expenses of my last illness and funeral, and the expenses of the administration of my estate, I give, devise and bequeath all of the property of which I die the owner, whether real,

personal or mixed to my nephew James Henrich, of Akron, Iowa to be his absolute property, with his children taking his share in the event he predeceases me. If my nephew so desires, he may divide up and distribute so much of said property among my other nephew and nieces in such amounts and in such a manner as he in his absolute discretion may deem best.

On August 18, 1982, Martin was admitted into the Akron Nursing Home where he resided until his death on March 28, 1983.

On April 6, 1983, James W. Henrich of Akron, Iowa, filed a petition for probate of Martin's 1982 will. The probate inventory shows estate assets of approximately $50,000. Plaintiffs, all relatives of Martin, filed a petition to set aside probate of will on October 19, 1983, alleging lack of due execution, lack of testamentary capacity, undue influence, fraud, and mistake. James Henrich, as executor and individually, filed a motion for summary judgment which plaintiffs resisted. The trial court sustained the motion finding that "plaintiffs do not show more than a scintilla of evidence indicating that there is a material fact question."

On appeal, plaintiffs assert that a genuine issue of material fact exists with respect to the following matters:

(1) whether Martin's 1982 will was duly executed in compliance with Iowa Code sections 633.279–633.281;

(2) whether Martin lacked testamentary capacity, including his ability to identify the natural objects of his bounty, to know the desired distribution and the extent of his property, and to understand the nature of the instrument executed;

(3) whether James W. Henrich unduly influenced or deceived Martin into executing the 1982 will; and

(4) whether there was a mistake in the execution of the 1982 will because it referred solely to James Henrich as Martin's nephew when in actuality he is a great-nephew.

The general principles governing our review of the trial court's grant of a motion for summary judgment are well established.

Summary judgment is proper when there is no genuine issue of fact and the moving party is entitled to judgment as a matter of law. Iowa R.Civ.P. 237(c). In reviewing the grant of a summary judgment motion, we must determine whether a genuine issue of material fact exists and whether the law was correctly applied. *Adam v. Mt. Pleasant Bank & Trust Co.*, 355 N.W.2d 868, 872 (Iowa 1984). In *Daboll v. Hoden*, 222 N.W.2d 727 (Iowa 1974), the Iowa Supreme Court said:

> The purpose of the rule is to avoid useless trials. Where there is no genuine issue of fact to be decided, the party with a just cause should be able to obtain a judgment promptly and without the expense and delay of a trial. [citations] In ruling on a motion for summary judgment, the court's function is to determine whether such a genuine issue exists, not to decide the merits of one which does.

*Id.* at 731.

In order to rule upon such motion, the court must examine the entire record before it, including the pleadings, admissions, depositions, answers to interrogatories, and affidavits, if any. *Drainage Dist. No. 119 v. Incorporated City of Spencer*, 268 N.W.2d 493, 499 (Iowa 1978). The burden to show the absence of any genuine issue of material fact is upon the moving party. The record is viewed in the light most favorable to the opposing party. *Swets Motor Sales, Inc. v. Pruisner*, 236 N.W.2d 299, 304 (Iowa 1975). However, to successfully resist a motion for summary judgment, the resisting party must set forth specific evidentiary facts showing the existence of a genuine issue of material fact. *Liska v. First Natl. Bank*, 310 N.W.2d 531, 534 (Iowa Ct.App.1981). He cannot rest on the mere allegations or denials of the pleadings. *Id.;* Iowa R.Civ.P. 237(c).

*Becker v. Star Auto, Inc.,* 376 N.W.2d 645, 646–47 (Iowa Ct.App.1985). A fact question is generated if reasonable minds can differ on how the issue should be resolved. *Knapp v. Simmons,* 345 N.W.2d 118, 121 (Iowa 1984). More than a "scintilla" of evidence is required to generate a genuine issue of material fact on the grounds of lack of due execution, lack of testamentary capacity, undue influence, fraud, and mistake. *In re Estate of Davenport,* 346 N.W.2d 530, 531–32 (Iowa 1984).

**Due Execution.** A will to be valid in Iowa must be executed in accordance with the requirements set forth in Iowa Code section 633.279(1) (1985). A will must be:

1. In writing;

2. Signed by the testator;

3. Declared by the testator to be his will;

4. Witnessed by two competent witnesses who:

 a. Signed at the request of the testator,

 b. Signed in the presence of the testator, and

 c. Signed in the presence of each other.

▆ Plaintiffs allege no violation of these statutory requirements in the execution of Martin's 1982 will. The facts surrounding the execution of the will are undisputed and come from the deposition of Attorney C.W. Down. The will was in writing, signed by Martin in the presence of two witnesses over the age of sixteen, and signed by the two witnesses in Martin's presence and in the presence of each other.

Furthermore, Down read the will and the attestation clause to Martin and asked him if it was what he desired before the formal execution occurred. Martin answered affirmatively. This client-lawyer colloquy ensured that Martin realized the testamentary significance of his actions. *See In re Estate of Graham,* 295 N.W.2d 414, 417 (Iowa 1980).

Because Martin's 1982 will was duly executed, we conclude that plaintiffs failed to raise a material issue on this ground.

▆ **Testamentary Capacity.** In order for a decedent to have general mental capacity to make a will, he must know and understand 1) the nature of the instrument then being executed; 2) the nature and extent of his property; 3) the natural objects of his bounty; and 4) the distribution he desires to make of his property. *In re Estate of Adams,* 234 N.W.2d 125, 127 (Iowa 1975). All of the above four elements must exist coextensively at the time the will is executed. *In re Estate of Gruis,* 207 N.W.2d 571, 573 (Iowa 1973). The will is invalidated if any one of such tests is not met. *In re Estate of Springer,* 252 Iowa 1220, 1224, 110 N.W.2d 380, 383 (1961). The proof of a mental deficiency must be applicable to the time of making the will. *In re Estate of Roberts,* 258 Iowa 880, 889, 140 N.W.2d 725, 730 (1966). However, "[w]hile it is true that evidence of mental capacity must refer to the exact time of the making of the will, evidence of the condition of the mind of the testator at other times may be received if there is a reasonable basis for the conclusion that it throws some light on his mental competence at the time the will was made." *Gruis,* 207 N.W.2d at 573.

▆ James Henrich provided affidavits in support of the motion for summary judgment from Martin's treating physicians, the nursing home administrator, the activities director of the nursing home, a nurse at the nursing home, a close friend of Martin's, and one of Martin's nieces, Christa Henrich, who visited Martin in late July and early August of 1982. These affidavits consistently described Martin as alert, strong-willed, capable of speaking his mind, and having a good sense of humor. The nursing home administrator and activities director stated that at the first of every month they discussed Martin's bill with him, and observed Martin write his check and receive a receipt. Furthermore, none of Martin's medical records indicate any psychological infirmities or strange behav-

ior by Martin during 1982. The hospital records indicate that no medication was given to Martin on August 8, 9, or 10 and he denied having any pain on those dates. Martin's medical records show he had good hearing and vision, did not use a hearing aid, and only occasionally used glasses. The nursing home records also indicate that Martin's sister, Catherine Topf, often contacted Martin and upset him.

C.W. Down, the attorney who witnessed the execution of Martin's will, testified by oral deposition. He stated that on April 9, 1982, he informed Martin in Martin's hospital room that the document he was to sign was his will, how it must be executed, read the document verbatim to him, asked if this was what he wanted, and informed him that it must be signed in the presence of two disinterested witnesses. Down specifically remembered going through these steps because he knew there was only one beneficiary in the will and that there were other family members. Down stated that Martin appeared to be very alert and he was in fact surprised to see Martin in such good condition. The will was signed by Martin and witnessed by Down and Sid Slater, the hospital administrator.

Attorney Bauerly also testified by oral deposition that when he and Martin discussed the proposed beneficiary change, Martin realized the small nature of his estate, the payments required for his health care, and the large number of his nieces and nephews. Bauerly informed Martin of the burden that would be placed on James Henrich by giving him the discretion to divide the assets amongst the nieces and nephews, but Martin elected to follow this route. Bauerly also testified that throughout Martin's stay in the nursing home his sister, Catherine, attempted to gain control of Martin's bank accounts. At Martin's request, Bauerly sent a certified letter to Catherine on January 27, 1983, stating that Martin fully understood the nature and extent of his property holdings, had his estate affairs in order, and did not wish her to control his accounts.

Affidavits from Martin's sisters, Irene Kallsen and Catherine Topf, state that on July 12, 1982, they visited Martin in his apartment. He appeared to be very sick and in a lot of pain. Martin told them that he wanted to cash his stocks and bonds to make cash gifts to his relatives. Catherine took Martin to Akron's First National Bank on that day. Martin reviewed the contents of his safety deposit box and then requested that Irene prepare a list of his nieces and nephews, which she did. Martin discussed with Irene and Catherine the possibility of writing out equal checks from his checking account to all of his nieces and nephews. On July 13, 1982, Catherine again took Martin to the bank and he removed his stocks and bonds from this safety deposit box and requested Catherine to sign the safety deposit box admission card for him. Martin cashed the stocks and bonds that day and directed that the resultant $23,314.41 be deposited in his checking account at the First National Bank. Martin's checking account summary for July of 1982 shows such a deposit occurred on July 21. On July 30, 1982, Martin cashed another investment document and deposited $12,395.24 in his checking account.

Catherine and Irene indicated by affidavit that during one visit with Martin in the hospital on August 8, 1982, he refused to eat or take a bath. On another visit soon after he entered the nursing home, he demonstrated confusion about whether he was residing there free of charge. They also stated that Martin was extremely hard of hearing during the last years of his life.

Even viewing these facts in the light most favorable to the plaintiffs, we find nothing in the record tending to establish a lack of testamentary capacity on the part of Martin at the time the will was executed. Even though in July of 1982, Martin cashed in his investment documents, spoke of distributing cash to his nieces and nephews, and was initially confused about his health care costs, this evidence does not generate a material issue of fact on the question of Martin's testamentary capacity. These facts do not call into question the fact that Martin knew that he was executing a will

changing his previous distribution scheme, knew the extent of his property holdings, the natural objects of his bounty, and his desired distribution. Therefore, the trial court properly sustained the motion for summary judgment on this ground.

 **Undue Influence.** This ground of will invalidation requires proof of four elements:

1) the testator must have been susceptible to undue influence; 2) the person alleged to have exercised undue influence must have had the opportunity to exercise it; 3) such person must have had a disposition to influence the testator unduly for the purpose of procuring an improper favor; and 4) the result must clearly appear to be the effect of undue influence.

*Adams,* 234 N.W.2d at 128 (citing *Frazier v. State Central Savings Bank,* 217 N.W.2d 238, 244 (Iowa 1974)). Undue influence may be and usually is proven by circumstantial evidence. *Frazier,* 217 N.W.2d at 243. "The exertion of influence that was undue cannot be inferred alone from opportunity, but there must be some testimony, direct or circumstantial, to show that influence was not only present but that it was in fact exerted with respect to the making of the testament itself." *Davenport,* 346 N.W.2d at 533 (quoting *Rothermel v. Duncan,* 369 S.W.2d 917, 923 (Tex.1963)). "Mere suspicion, surmise, conjecture, or speculation is not enough to warrant a finding of undue influence, but there must be a solid foundation of established facts upon which to rest an inference of its existence." *Davenport,* 346 N.W.2d at 533 (quoting *In re Knott's Estate,* 164 Neb. 365, 370, 82 N.W.2d 568, 572 (1957)).

[U]ndue influence must dominate the motives of the testator in executing his will. It must be equivalent to "moral coercion."

In order to support the burden of proof of undue influence, it is generally insufficient for the contestant to merely show inequality of distribution under the will, although that fact combined with other circumstantial evidence may support a verdict in contestant's favor. Likewise, a testator's physical or mental weakness is not sufficient to prove undue influence, although evidence of such weakness is admissible to show a tendency towards susceptibility to undue influence. It is also generally insufficient to show minimal acts of influence as evidence of undue influence. Rather, the contestant must show a continuing and persistent effort to unduly influence the testator which destroys the testator's free will. (footnotes omitted).

1 S. Kurtz, *Kurtz on Iowa Estates,* § 4.45, at 175 (1981).

The plaintiffs' bare suspicions will not suffice to support the claim of undue influence. They offer no evidence, direct or circumstantial, that Martin was susceptible to influence nor evidence that James Henrich was disposed to influence Martin to procure sole beneficiary status. While it is arguably established that James Henrich had the opportunity to exercise undue influence when he visited Martin on two occasions at the hospital, opportunity alone is insufficient to support an inference of undue influence. *See Davenport,* 346 N.W.2d at 532–33. There is also no evidence that James Henrich intentionally misrepresented anything to Martin or that Martin was otherwise deceived.

We, therefore, conclude that plaintiffs have failed to generate a genuine issue of material fact on the question of undue influence or fraud.

 **Mistake.** The general rule is that the validity of a will or any part of it is not affected by a mistake of either law or fact inducing the execution of the will, unless fraud or undue influence was perpetrated upon the testator. 79 Am.Jur.2d *Wills* § 415 at 568–69 (1975). Furthermore, "the mistake of the testator as to the status of a beneficiary or his relationship to the beneficiary, which is not the result of any fraud, concealment, or suppression of facts by the beneficiary, is not a ground for defeating the bequest on probate." *Id.,* § 417 at 570.

The Iowa Supreme Court has recognized that a decedent's mistaken belief of facts will not constitute a basis for invalidation or reformation of a will. *Riley v. Casey*, 185 Iowa 461, 464, 170 N.W. 742, 743 (1919); *see also Kurtz* § 4.47 at 177–78. In *Riley*, decedent mistakenly believed two relatives had received conveyances of land from their grandmother and therefore excluded them as beneficiaries. The court held that proof of mistake was not of itself proof of an insane delusion.

In the case at bar, plaintiffs argue that because James Henrich is not Martin's nephew, but rather Martin's great-nephew, the 1982 will referring to James Henrich as his nephew should be invalidated. Plaintiffs also allege that a mistake is demonstrated in Martin's 1982 will because Martin also has a nephew named James Henrich who lives in LeMars, Iowa, and therefore claim the will is unclear as to which James Henrich is intended to be the beneficiary.

We find this argument is sophistry. The testamentary language is "to my nephew James Henrich of Akron, Iowa." The evidence is undisputed that Martin always referred to James Henrich as his nephew and Attorney Bauerly testified that it is common practice for the term "nephew" to encompass great-nephews as well. It is not questioned that James Henrich of Akron had regular contact with Martin, while James Henrich of LeMars, Iowa, had virtually none. We conclude that plaintiffs have failed to generate a genuine issue of material fact on the question of mistake.

AFFIRMED.