In the Matter of the ESTATE OF Luella BAYER, Deceased.

Joan BECKER, Lois Taphorn, Betty Huegerich, Tim Hackfort, Jenna Hackfort, Colleen Steffes, Doreen Stueve, Mary Pluckhahn, Nancy Gach, Bob Hackfort, John Hackfort, Dan Hackfort, Karen Kerkhoff, David Hackfort, and Bill Hackfort, Appellants,

v.

Larry SCHENKELBERG, Individually and as Executor of the Estate of Luella Bayer; Gerald Tigges, Mary Kay Tigges, Individually; and Robert Janssen and Barbara Janssen, Individually; Debbie Trannell and Gene Trannell, Individually; St. Mary's Catholic Church and St. Anthony's Regional Hospital, Appellees.

No. 96–632.

Supreme Court of Iowa.

Jan. 21, 1998.

As Amended on Denial of Rehearing March 9, 1998.

668

David E. Green of Green and Siemann Law Firm, Carroll, and Robert Kohorst and William Early of Kohorst Law Firm, Harlan, for appellants.

Frank J. Comito of Neu, Minnich, Comito & Hall, Carroll, and Colin J. McCullough of McCullough Law Firm, Sac City, for appellees.

Considered by McGIVERIN, C.J., and CARTER, LAVORATO, ANDREASEN, and TERNUS, JJ.

McGIVERIN, Chief Justice.

In this case, we must decide whether the district court properly granted defendants' motion for judgment notwithstanding the verdict, thereby setting aside the jury's verdict that the testator's will was the result of undue influence.

On appeal, the court of appeals reversed the district court ruling. On further review, we vacate the decision of the court of appeals and affirm the district court's ruling.

## I. Background facts and proceedings.

Luella Bayer died testate on September 29, 1994, at the age of seventy-five. Mrs. Bayer was a widow, her husband having passed away in 1980. She had no children and her only surviving relatives consist of her only brother's children and grandchildren. Those fifteen persons are her nieces and nephews and grandnieces and grandnephews. Her will, executed on February 6, 1991, was admitted to probate on October 3, 1994. The will was drafted by attorney William D. Kurth, who had been Mrs. Bayer's attorney for several years.

The probate inventory of Mrs. Bayer's estate showed approximately $1.1 million in assets. By the terms of her will, Mrs. Bayer designated her friend, Larry Schenkelberg, as executor, and left him substantial portions of her estate. Mrs. Bayer's hired man and his wife, Robert and Barbara Janssen, and Mrs. Bayer's farm tenants, Gerald and Mary Kay Tigges, also received significant bequests. The will also left twenty shares of Carroll County Bank Stock to Debbie Trannell and $1000 to St. Mary's Church of Willey, Iowa, for masses. The residue of the estate was left to St. Mary's Church and St. Anthony's Regional Hospital of Carroll, Iowa.

None of the individuals named in the will were related to Mrs. Bayer, but had known her for several years. Schenkelberg was a friend of Mr. and Mrs. Bayer for many years, and his relationship with Mrs. Bayer continued after Mr. Bayer's death in 1980. Schenkelberg visited Mrs. Bayer at her home a few times a week and the two often had meals together. Mrs. Bayer often consulted with Schenkelberg regarding farm business such as purchasing equipment and selling crops. He assisted Mrs. Bayer in purchasing a new Cadillac automobile in 1992. Schenkelberg also bought Mrs. Bayer gifts, including jewelry, flowers, and gift certificates. Plaintiffs presented evidence at trial that Schenkelberg had asked Mrs. Bayer to marry him, and that he told her she should sell the farm and move to Arizona with him.

Robert Janssen and his wife Barbara, lived on one of Mrs. Bayer's three farms and Robert farmed Mrs. Bayer's land. Robert visited with Mrs. Bayer almost everyday and Mrs. Bayer often stated that he was like a son to her and that he should have a farm. Barbara Janssen and her children also visited with Mrs. Bayer on occasion. Gerald Tigges, the third primary beneficiary named in Mrs. Bayer's will, rented the portion of Mrs. Bayer's land known as the "north farm" and was also a close friend. The two often visited together on the telephone discussing farm business and also sat together at church.

Plaintiffs, who were Mrs. Bayer's nieces, nephews, grandnieces, and grandnephews, filed an action to set aside the will on the ground that defendants, beneficiaries under the will, had unduly influenced Mrs. Bayer in the distribution of her property under the will. The petition named Larry Schenkelberg, Gerald and Mary Kay Tigges, Robert and Barbara Janssen, Debbie and her husband Gene Trannell, St. Mary's Catholic Church, and St. Anthony's Regional Hospital as defendants. A jury trial was held. Plaintiffs' case focused on the actions of Schenkelberg, the Janssens and the Tigges. Plaintiffs presented no evidence of undue influence on the part of defendants, Debbie and Gene Trannell, the church or the hospital. At the conclusion of all the evidence, defendants moved for a directed verdict concerning the issue of undue influence, but the court overruled the motion. Defendants requested a jury instruction that would require the jury to determine separately whether each of the five main defendants (Schenkelberg, the Janssens and the Tigges) had unduly influenced Mrs. Bayer concerning the terms of her will. The court denied the request.

The jury returned a verdict in favor of plaintiffs, finding that Mrs. Bayer's 1991 will

was the result of undue influence by defendants. The district court entered judgment on the verdict and set aside the will.

Thereafter, defendants filed a motion for judgment notwithstanding the verdict, asserting that plaintiffs had failed to present substantial evidence of undue influence to justify submitting the case to the jury and that the court should have sustained defendants' motion for directed verdict. Defendants also filed a motion for new trial, arguing that the court erred in refusing to grant defendants' requested jury instruction regarding the alleged culpability of each of the five main defendants. The court granted defendants' motion for judgment notwithstanding the verdict and set aside the jury's verdict based on its conclusion that plaintiffs failed to present substantial evidence of undue influence. The district court ruled the will of Mrs. Bayer, that had previously been admitted to probate, was valid. The court did not rule on defendants' motion for a new trial.

Plaintiffs appealed, claiming that the district court erred in: (1) sustaining defendants' motion for judgment notwithstanding the verdict and setting aside the jury's verdict; (2) refusing to give plaintiffs' requested jury instruction as to whether a confidential relationship existed between Mrs. Bayer and defendants; and (3) excluding certain evidence offered by plaintiffs.

Defendants cross-appealed, asserting that if the district court's ruling on judgment notwithstanding the verdict was reversed, then defendants were entitled to a new trial because the district court erred in refusing to give defendants' requested jury instruction as to whether each of the five main defendants had unduly influenced the testator.

We transferred the case to the court of appeals which reversed the district court. We granted defendants' application for further review and now consider the issues raised by the appeal and cross-appeal.

## II. Standard of review.

An action to set aside a will is tried as a law action and our review on appeal is for correction of error of law. Iowa Code § 633.33 (1995); Iowa R.App. P. 4; *In re*

*Estate of Grulke,* 546 N.W.2d 626, 627 (Iowa App.1996).

The district court sustained defendants' motion for judgment notwithstanding the verdict. Iowa Rule of Civil Procedure 243(b) provides:

> If the movant was entitled to have a verdict directed for him at the close of all the evidence, and moved therefor, and the jury did not return such verdict, the court may then either grant a new trial or enter judgment as though it had directed a verdict for the movant.

The purpose of rule 243(b) is to afford the trial court an opportunity to correct its error in failing to sustain a motion for directed verdict where the movant was entitled to a directed verdict at the close of all evidence. *In re Will of Pritchard,* 443 N.W.2d 95, 97 (Iowa App.1989). When considering a motion for judgment notwithstanding the verdict on appeal, we view the evidence as the trial court did in ruling on the motion, that is, in the light most favorable to the party against whom the motion was directed. *East Broadway Corp. v. Taco Bell Corp.,* 542 N.W.2d 816, 820 (Iowa 1996); *Pritchard,* 443 N.W.2d at 97.

A motion for judgment notwithstanding the verdict should be denied if there is substantial evidence to support the claim. *Faught v. Budlong,* 540 N.W.2d 33, 35 (Iowa 1995). Conversely, absent such evidence, judgment notwithstanding the verdict may be sustained. *Johnson v. Dodgen,* 451 N.W.2d 168, 171 (Iowa 1990). "Evidence is substantial when a reasonable mind would accept it as adequate to reach a conclusion." *Id.* (citing *Briggs v. Board of Dirs. of Hinton Community Sch. Dist.,* 282 N.W.2d 740, 743 (Iowa 1979)).

Evidence is not insubstantial simply because it may support contrary inferences. *Boehm v. Allen,* 506 N.W.2d 781, 784 (Iowa App.1993). If reasonable minds could differ on the issue, a jury question is engendered. Iowa R. App. P. 14(f)(17). A court cannot set aside a verdict just because it may have reached a different result. *Boehm,* 506 N.W.2d at 784. In a will contest, weight and credibility of the evidence are questions for a

jury. *In re Estate of Kirby,* 241 Iowa 340, 342, 41 N.W.2d 8, 9 (1950).

### III. Whether there was substantial evidence to generate a jury question on the issue of alleged undue influence by the five main defendants on testator.

We first consider the issue raised on plaintiffs' appeal as to whether there was sufficient evidence to generate a jury question concerning undue influence.

■■■ A. The general rule is that:

Undue influence must be such as to substitute the will of the person exercising the influence for that of the testator, thereby making the writing express, not the purpose and intent of the testator, but that of the person exercising the influence. It must operate at the very time the will is executed and must be the dominating factor.

*In re Estate of Davenport,* 346 N.W.2d 530, 531–32 (Iowa 1984) (quoting *In re Estate of Roberts,* 258 Iowa 880, 888, 140 N.W.2d 725, 730 (1966) (citations omitted)). In order to set aside a will on grounds of undue influence, contestants must prove that: (1) the testator was susceptible to undue influence; (2) defendants had an opportunity to exercise undue influence and effect the wrongful purpose; (3) defendants had a disposition to influence unduly to procure an improper favor; and (4) the result, reflected in the will, was clearly the effect of undue influence. *Davenport,* 346 N.W.2d at 532; *In re Estate of Herm,* 284 N.W.2d 191, 200–201 (Iowa 1979). The party contesting a will bears the burden of proving all four elements. *Roberts,* 258 Iowa at 889, 140 N.W.2d at 730.

■■■ For influence to be considered undue, it must be the "equivalent to moral coercion." *In re Hollis' Estate,* 234 Iowa 761, 769, 12 N.W.2d 576, 581 (1944). Direct proof of undue influence is not required and circumstantial evidence may be sufficient. *Roberts,* 258 Iowa at 889, 140 N.W.2d at 730. However, more than a "scintilla" of evidence is required. *In re Estate of Cory,* 169 N.W.2d 837, 842 (Iowa 1969). "An unnatural disposition of property will not of itself carry the issue of undue influence to the jury." *In re Grahlman's Will,* 248 Iowa 535, 554, 81 N.W.2d 673, 684 (1957) (quoting 95 C.J.S. *Wills* § 463 (1957)). "Mere suspicion, surmise, conjecture, or speculation is not enough to warrant a finding of undue influence, but there must be *a solid foundation of established facts upon which to rest an inference of its existence.*" *Pritchard,* 443 N.W.2d at 98 (emphasis added); *accord Davenport,* 346 N.W.2d at 533.

Defendants apparently do not dispute the fact that they had an opportunity to influence Mrs. Bayer in the distribution of property under her will. They do contest the sufficiency of the evidence as it relates to the susceptibility element, whether they had a disposition to influence unduly, and whether the result, reflected in the will, was clearly the effect of undue influence.

■■■ B. Plaintiffs contend that substantial evidence exists in the record from which a reasonable jury could conclude that Mrs. Bayer's will was the result of undue influence. Plaintiffs contend that Mrs. Bayer's susceptibility to undue influence is shown by evidence that she: (1) consulted with others regarding her clothing and home furnishings; (2) consulted with Schenkelberg when making decisions regarding farm business and purchasing cars; (3) liked attention, especially from men, regarding her looks, clothes or her talent for cooking; (4) disregarded her attorney's advice that she cash rent all of her property and that she fire Janssen as a hired man; and (5) was not financially astute in that she was confused regarding her finances and did not fully comprehend her wealth. Plaintiffs also point out that their expert, Dr. Rosmann, testified that in his opinion, Mrs. Bayer was "significantly influenced by the beneficiaries of her Will." "And she was susceptible to influence at the time the Will was made." Dr. Rosmann never examined Mrs. Bayer, and did not interview any of the defendants. Dr. Rosmann formed his opinion that Mrs. Bayer was susceptible to influence after reviewing depositions of plaintiffs and Mrs. Bayer's medical records.

Plaintiffs assert they established defendants' disposition to influence Mrs. Bayer by evidence that: (1) Mrs. Bayer's attorney believed Janssen "tr[ied][to] secure advances on his pay or loans from Luella"; (2) Mrs.

Bayer continued to loan money to Janssen even though her attorney advised her to fire him and that she objected to the loans; (3) Schenkelberg allegedly proposed marriage to Mrs. Bayer, gave her gifts and complimented her in order to "get on her good side"; and (4) that Gerald Tigges had remarked that he needed "to get one more crack at her and then I'll have that north farm."

Plaintiffs also contend they presented substantial evidence that the distribution of property in the will was clearly the result of undue influence, including that the distribution of property matches evidence showing defendants had a disposition to unduly influence Mrs. Bayer. Plaintiffs point out that: (1) Tigges received the north farm (after apparently getting "one more crack at Mrs. Bayer"); (2) Janssen received his "nest," the place where he had been living, despite attorney Kurth's advice that Mrs. Bayer fire him; (3) Schenkelberg allegedly spoke with Mrs. Bayer the day the will was executed; (4) Schenkelberg received the bulk of Mrs. Bayer's personal property and real property, including her household goods, which plaintiffs argue are usually reserved for a spouse, not a mere friend, as well as the Cadillac automobile he helped her purchase; (5) plaintiffs received nothing despite Mrs. Bayer's "promises"; and (6) Mrs. Bayer's other friends received nothing under the will.

C. In response, defendants contend that the evidence relied upon by plaintiffs to support their undue influence claim consists of unsubstantiated hearsay, rumor and innuendo. Defendants characterize their actions as nothing more than kindness, friendship, and social interaction.

Defendants also assert that Mrs. Bayer's distribution of property to defendants, rather than plaintiffs, was reasonable and logical. Defendants point out there was no evidence that Mrs. Bayer had a "close" relationship with any of the plaintiffs. Defendants point to evidence that plaintiffs' contact with Mrs. Bayer was infrequent and occasional. There was little, if any evidence, that she included them in her social life or that they included her in their social activities. Witnesses testified that they rarely heard Mrs. Bayer mention plaintiffs, or saw them visit or socialize with her. Defendants further contend that Mrs. Bayer's statements to plaintiffs that

their lives "would be easier" only reflect her state of mind.

On the other hand, defendants point out that they were close friends of Mrs. Bayer and had a caring relationship with her for many years. Witnesses testified that Mrs. Bayer considered Robert Janssen as her son and that he should have a farm because he was like a son to her. In any event, defendants point out that Mrs. Bayer had a right to change her mind regarding distribution of her property.

D. Having considered the arguments and reviewed the evidence in a light most favorable to the plaintiffs, we agree with the district court's conclusion that plaintiffs failed to present substantial evidence that the distribution of property in Mrs. Bayer's will was the result of undue influence.

First, although Mrs. Bayer may have been susceptible to flattery and attention, and often consulted with defendants when making important decisions, the record does not show that she was so timid or weak-minded that her motives in executing her will were not her own. *See Pritchard,* 443 N.W.2d at 98–99.

For instance, the evidence shows that Mrs. Bayer was a bright woman who continued to perform duties associated with the farming business after her husband's death. She also visited neighbors and local businesses on her egg route. Father Harrington, Mrs. Bayer's priest testified, "Luella was her own woman, she had her own say, and I always felt that she was rather—she was assertive in what she liked and disliked." Father Harrington also testified that he was surprised by Mrs. Bayer's will "by the fact that there wasn't more given to the church," but that he was not surprised that Mrs. Bayer's farms were given to Schenkelberg, the Janssens, and the Tigges.

Mrs. Bayer's attorney, William Kurth, described her ability to carry on her business affairs as follows:

Q. And how would you describe her from your observations as far as her ability to carry on a business conversation with you about her will or her business affairs?
A. She was very astute.

Q.   What do you mean by that?

. . . .

A.   Luella knew what she was wanting to accomplish and she was able to sit down and do it.   She had worked it through. For example, when a bill would come in, she would pay it that day.   She wouldn't wait till a later time.   She made sure she got her business done on time and when it was due rather than letting it pile up and then try and do it later on.

Additionally, Mrs. Bayer agreed that her voluntary stand-by petition of conservatorship which named Schenkelberg as conservator, should include language stating that the petition "was not to take effect unless Dr. J.G. Donovan, Larry Schenkelberg, and William D. Kurth ... filed verified affidavits that she was unable to care for her person and/or her property."   According to attorney Kurth, this language was included so that "it would be unable for any individual to take advantage of her.   It would take three different people who didn't even know each other that well to agree."   This evidence shows that Mrs. Bayer was level-headed and concerned about people taking advantage of her.

Moreover, as the district court noted, plaintiffs presented no evidence that Mrs. Bayer was mentally unstable or that she lacked the mental ability to carry on daily activities.   Dr. Jeffrey Larkin, Mrs. Bayer's own doctor, testified that in his opinion, she did not appear susceptible to influence by other persons when he examined her in 1990–91.   The following excerpt from the trial record is illustrative:

Q.   Doctor, from your examinations and from your visits with Luella, did she appear to be able to maintain and make her own health care and living decisions?   A. Yes. She was able to check her blood sugars as far as her diabetes.   She is in control of that and her diet and her medications and her day-to-day activities as far as I know.

Q.   Doctor, what does that indicate to you, a patient of her age that's able to maintain and take care of herself such as you've just outlined?   A. Well, Luella was a very independent person and self-sufficient.   She relied on her hired man quite a bit for the farm work and that type of

thing, but she—she did some minor chores too.

This evidence shows that Mrs. Bayer was alert and mentally stable.   Cf. *Boehm*, 506 N.W.2d at 784 (testator suffered from severe arthritis and alcoholism); *In re Estate of Adams*, 234 N.W.2d 125, 128 (Iowa 1975) (testator was confused, disoriented and did not recognize people she had known for many years).

Second, the circumstances surrounding execution of the will are devoid of evidence that Mrs. Bayer was forced into making or signing her will, or that defendants played a part in the execution of the will.   For instance, Mrs. Bayer met alone with her attorney to discuss the will and none of the beneficiaries were present at the time it was executed. Cf. *Boehm*, 506 N.W.2d at 784 (beneficiary meets alone with testator and requests changes in testator's will); *Dankbar*, 430 N.W.2d at 127 (beneficiary helps testator draft will one month after testator was discharged from hospital; testator diagnosed as having schizophrenia); *Adams*, 234 N.W.2d at 128 (beneficiary takes testator to attorney); *Frazier v. State Cent. Sav. Bank*, 217 N.W.2d 238, 240 (Iowa 1974) (beneficiary takes testator to different attorney); *In re Ramsey's Estate*, 252 Iowa 48, 49, 105 N.W.2d 657, 657–58 (1960) (beneficiary helps type will); *In re Estate of Farlow*, 243 Iowa 15, 18, 50 N.W.2d 561, 563 (1951) (beneficiary encourages testator to make will in her favor).

Additionally, attorney William Kurth testified regarding Mrs. Bayer's reasons for the distribution of her property.   He stated that she told him her intent as to how she wanted her property to be distributed.   He said, "[a]nd thus we did it in that manner," despite the tax consequences associated with the manner of distribution.   Kurth also testified that he discussed other ways of distributing property such as living trusts and life estates, but that Mrs. Bayer was not interested in those options.   Kurth further testified that Mrs. Bayer did not indicate that any of the defendants had talked to her about distributing her property.   Kurth also stated that he was "not aware of any activity of anyone to unduly influence a will," and that he never

discussed Mrs. Bayer's will with .Schenkelberg at her home or at any other location.

Finally, we agree with the district court's finding that Mrs. Bayer's testamentary distribution of property was not the result of undue influence. The evidence shows that defendants socialized with Mrs. Bayer and were her companions. She exchanged gifts and shared meals with defendants, and had weekly, if not daily contact with them. As the district court noted, "Luella Bayer lived, communicated, and interacted with those people with whom she was comfortable and close. . . ."

In contrast to defendants' relationship with Mrs. Bayer, the evidence shows that plaintiffs seldom socialized with Mrs. Bayer and rarely visited with her at her home. This is not a situation where the testator had a strained relationship with relatives. The point is simply that plaintiffs did not have a close relationship with Mrs. Bayer. Absent any evidence of a meaningful relationship between Mrs. Bayer and plaintiffs, Mrs. Bayer's statements to plaintiffs that their "lives would be easier" and the subsequent distribution of her property to defendants do not support the presumption that she was unduly influenced concerning the provisions of her will. In any event, Mrs. Bayer had the right to change her mind regarding distribution of her property. *See Drosos v. Drosos,* 251 Iowa 777, 786–787, 103 N.W.2d 167, 172 (1960).

Given defendants' meaningful relationship with Mrs. Bayer, the fact that she enjoyed defendants' attention and flattery, and that she consulted with them regarding important decisions, any influence they had on her decisions is not the equivalent of "moral coercion." *See Pritchard,* 443 N.W.2d at 99 (record failed to reflect influence was equivalent of moral coercion or that beneficiary's influence dominated decedent's motives in executing will). As the district court noted, the fact that Mrs. Bayer sought advice from defendants concerning crops, and other daily activities, would not be unnatural for a seventy-year-old widow. At most, any influence exerted by defendants only raises the possibility of influence which is not sufficient to support a finding of undue influence and lacks "a solid foundation of established facts upon which to rest an inference" of undue

influence. *Pritchard,* 443 N.W.2d at 98; *accord Davenport,* 346 N.W.2d at 532.

Furthermore, the fact that Mrs. Bayer left her. property to defendants, her friends, or that they received property under the will because of their acts of kindness or friendship, does .not support the presumption of undue influence. 79 Am.Jur.2d *Wills* § 427 (1975). As the district court stated, "What more natural distribution of property than to those who have assisted and befriended a person during her lifetime."

As we previously discussed in *Davenport,*

> Any time a will provides for other than an equal distribution, a disappointed heir could claim an inference of undue influence and a corresponding fact question because reasonable minds could always differ about the purpose of the distribution. But such a position would have the effect of giving a factfinder a carte blanche to rewrite most wills. Second guessing should not be permitted to void a will that complies with established guarantees of trustworthiness.

> [A] solemn testament executed under the formalities required by law by one mentally capable of executing it should not be set aside upon a bare suspicion of wrongdoing.

(Citation omitted.) *Rothermel,* 369 S.W.2d at 922–23. Some significant factual basis is needed to support the claim and defeat the otherwise obvious intent of the testator. John's bare suspicions will not suffice.

*Davenport,* 346 N.W.2d at 533.

In summary, we conclude that plaintiffs failed to present substantial evidence that Mrs. Bayer's will was the result of undue influence to justify submitting the case to the jury. There was no "solid foundation of established facts upon which to rest an inference" of undue influence. *See id.* We therefore conclude that the district court properly sustained defendants' motion for judgment notwithstanding the verdict.

We next consider plaintiffs' other issues raised on appeal.

*IV. Burden of proof concerning existence of confidential relationship between testator and beneficiary.*

■ Plaintiffs contend a confidential relationship existed between defendants and Mrs. Bayer, and that therefore, any transaction between them by which defendants profited at Mrs. Bayer's expense was presumptively fraudulent. The burden of proof would then shift to defendants to negate the presumption by clear and convincing proof.

■ Plaintiffs' view of the law concerning the existence of a confidential relationship between a testator and beneficiary is correct to the extent it relates to inter vivos transfers of property to the beneficiary. Here, however, plaintiffs only contest Mrs. Bayer's testamentary distribution of property to defendants. In such a case, a suspicion, not a presumption, of undue influence, arises where the dominant party in a confidential relationship participates in either the *preparation or execution of a contested will. In re Estate of Baessler*, 561 N.W.2d 88, 93 (Iowa App.1997); 79 Am.Jur.2d *Wills* § 428 (mere existence of confidential relations between testator and beneficiary under will does not raise presumption that beneficiary exercised undue influence over testator). As we discussed above, plaintiffs presented no evidence that defendants played a part in the execution or preparation of Mrs. Bayer's 1991 will. Thus, there is no merit to plaintiffs' contention that defendants were required to negate a presumption that they unduly influenced Mrs. Bayer concerning her 1991 will.

*V. Whether the district court abused its discretion in excluding plaintiffs' evidence as remote in time from just before and after execution of testator's will.*

■ Plaintiffs further contend that the district court abused its discretion in excluding certain evidence regarding events which took place before and after the time of execution of Mrs. Bayer's 1991 will. The trial court has discretion to determine relevancy pursuant to the rules of evidence and will not be reversed unless the discretion has been abused and a substantial right of a party has been affected. *Vaughan v. Must, Inc.*, 542 N.W.2d 533, 542 (Iowa 1996).

During trial, plaintiffs made three offers of proof as part of their case that Mrs. Bayer was unduly influenced in executing her will. First, plaintiffs sought to admit Deah Bruhn's testimony that defendant, Gerald Tigges, approached her following her husband's death in 1978. According to Bruhn, Tigges told her that her husband had told Tigges at an auction that he wanted Tigges to farm his land. When she asked Tigges when this conversation took place, Tigges told her that the conversation took place on a date when Bruhn knew her husband was at home and not at an auction.

Additionally, plaintiffs sought to admit plaintiff Bill Hackfort's testimony that defendant Schenkelberg wanted Mrs. Bayer to buy a new Cadillac automobile in 1992, but that Mrs. Bayer was reluctant to buy the vehicle because she thought it "would be a bundle of money and she did not want a new car." Plaintiffs' final offer of proof was plaintiff Jenna Hackfort's deposition testimony that Mrs. Bayer told her in 1981 that she [and the other plaintiffs] "would be taken care of some day and that things would be easier for us."

The district court disallowed the testimony. Defendants contend that the court properly excluded the evidence because it was too remote in time from the execution of the 1991 will and thus was irrelevant.

The general rule is that alleged undue influence "must operate at the very time the will is executed." *See Davenport*, 346 N.W.2d at 531–32. The proffered evidence ranged from ten years before to sixteen months after Mrs. Bayer's 1991 will. Clearly, this evidence was too remote from the execution of Mrs. Bayer's will and thus cannot be considered relevant. We, therefore, conclude that the district court properly exercised its discretion in excluding plaintiffs' proffered evidence.

We find no abuse of trial court discretion here.

*VI. Disposition.*

In summary, we conclude the district court properly sustained defendants' motion for judgment notwithstanding the verdict. We further conclude that the court properly exercised its discretion in excluding evidence proffered by plaintiffs. We find no merit in

other contentions raised by plaintiffs. Given our conclusions on the issues discussed above, we need not address other issues raised in defendants' cross-appeal. We vacate the decision of the court of appeals and affirm the district court's ruling sustaining defendants' motion for judgment notwithstanding the verdict. The case is remanded for further proceedings.

**DECISION OF THE COURT OF APPEALS VACATED; DISTRICT COURT RULING AFFIRMED; CASE REMANDED.**